UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TWITCH INTERACTIVE, INC., <br> Plaintiff, <br> v. <br> CREATINEOVERDOSE, et al., <br> Defendants. | Case No. 21-cv-07006-JST (SK) <br><br> **REPORT AND RECOMMENDATION REGARDING DEFAULT JUDGMENT** <br><br> Regarding Docket No. 58 |

This matter comes before the Court concerning the motion by Twitch Interactive, Inc. ("Plaintiff") against "CreatineOverdose" and "Mango" aka Mangoblacksunlegion or Mangoblacksun ("Defendants"). Default was entered against Defendants on December 22, 2022. (Dkt. No. 49.) Plaintiff filed its motion for entry of default judgment on May 2, 2023. (Dkt. No. 58.) This matter was referred to the undersigned for report and recommendation on May 9, 2023. (Dkt. No. 59.) This Court ordered Plaintiff to supply additional briefing on June 1, 2023, and Plaintiff supplied this briefing on June 26, 2023. (Dkt. Nos. 63, 66.) Defendants have been served but have not appeared in this case or responded to the motion for default judgment. For the reasons set forth below, the Court RECOMMENDS that the District Court GRANT IN PART and DENY IN PART Plaintiff's motion for default judgment.

**I.    Background**

Plaintiff is a real-time streaming service hosting millions of daily visitors. (Dkt. No. 58 at 6.) Plaintiff states that, in order to create an account or use Twitch services, users must agree to be bound by its Terms of Service, Community Guidelines, and Twitch Developer Services Agreement (collectively, the "Terms"). Specifically, the Terms state:

> The Terms of Service apply whether you are a user that registers an account with the Twitch Services or an unregistered user. You agree that by clicking 'Sign Up' or otherwise registering,

> downloading, accessing or using the Twitch Services, you are entering into a legally binding agreement between you and Twitch regarding your use of the Twitch Services. You acknowledge that you have read, understood, and agree to be bound by these Terms of Service.

(Dkt. No. 40 (Second Amended Complaint) at ¶ 28.) Plaintiff's terms of service specifically bar users from harassing others or posting "racist, homophobic, violent, or otherwise harmful content." (*Id.* at ¶ 31.) Plaintiff alleges that its terms and guidelines bar Defendants' behavior that forms the basis of this suit. (*Id.* at ¶ 34.)

Plaintiff alleges that, beginning in or about August 2021, Defendants began to engage in coordinated attacks on Plaintiff's streamers and viewers – attacks known as "hate raids." (Dkt. No. 58 at 7.) Plaintiff alleges that these attacks involved posting in streamers' chats with messages of hate, obscenity, racial and homophobic slurs, personally identifying information, malicious links to violent videos, graphic descriptions of violence against minorities, and claims that the Defendants were part of the KKK. (*Id.*; Dkt. No. 40 at ¶¶ 43-44.) Defendants are also alleged to have created "bot" accounts in order to launch large scale attacks on streamers. (*Id.* at ¶¶ 45-46.) Plaintiff alleges that Mango attempted to bring armed police officers to the home of a trans woman by "swatt[ing]" her and that Mango created a potentially dangerous situation for her, while she was streaming on Plaintiff's platform. (*Id.* at ¶48.) Swatting is a form of criminal harassment which involves making a false report to emergency services in the aim of bringing armed police to a victim's personal residence. Plaintiff additionally alleges that Mango created numerous accounts with Plaintiffs in order to "dox" previous victims of hate raids. (*Id.* at ¶ 49.) Doxing involves posting victim's private or identifying information online with malicious intent.

Plaintiff alleges that these hate raids have not only been offensive to users but have also been disruptive to users' ability to interact with streamers and viewers of streams. (*Id.* at ¶ 50.) Plaintiff states that it has made significant efforts to end Defendants' actions, and those efforts include banning each of Defendants' accounts, investigating with a fraud detection team, and creating new technology updates to attempt to stop Defendants' harassment. (*Id.* at ¶ 59.) However, the hate raids committed by Defendants have continued. (*Id.* at ¶ 52-53.)

**II. Jurisdiction**

Before entering default judgment, a court has "an affirmative duty to look into its jurisdiction over both the subject matter and the parties." *See In re Tuli v. Rep. of Iraq*, 172 F.3d 707, 712 (9th Cir. 1999). Here, the Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Complete diversity exists because Plaintiff is incorporated in Delaware with its principal place of business in California. (Dkt. No. 40 at ¶¶ 13-15.) Based on Plaintiff's investigation, Mango is a resident of Denmark, and CreatineOverdose is a resident of Austria. (*Id.* at ¶¶ 13-15.) The amount in controversy Plaintiff seeks is $328,164, over the $75,000 needed for diversity jurisdiction. (Dkt. No. 58 at 15.)

The Court has personal jurisdiction over Defendants because they have been properly served under Federal Rule of Civil Procedure 4 and because Defendants had significant contact with the forum state through use of Plaintiff's platform. Generally, "a federal court is without personal jurisdiction over a defendant unless the defendant has been served in accordance with Federal Rule of Civil Procedure 4." *Twitch Interactive, Inc. v. Johnston*, No. 16cv-03404-BLF, 2019 WL 3387977, at *3 (N.D. Cal. July 26, 2019) (quoting *Travelers Cas. & Sur. Co. of Am. v. Brenneke*, 551 F.3d 1132, 1135 (9th Cir. 2009)). When Plaintiff exhausted its investigatory options, it sought and obtained this Court's leave to serve Defendants by alternative means. (Dkt. Nos. 37, 44.) Plaintiff subsequently served both Defendants and filed Proofs of Service demonstrating that it served them via alternative means. (Dkt. Nos. 45, 46.) As such, Defendants have been properly served under Rule 4.

Additionally, Defendants had sufficient contacts with the forum state to establish personal jurisdiction. To establish minimum contacts, the relationship between the nonresident defendant, the forum, and the litigation "must arise out of contacts that the 'defendant *himself*' creates with the forum State." *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, 903 F.3d 896, 902 (9th Cir. 2018) (citing *Walden*, 571 U.S. 277, 284 (9th Cir. 2014) (emphasis in original). Additionally, the minimum contacts analysis examines "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* (citing *Walden*, 571 U.S. at 285). "[A] defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Walden*, 571 U.S. at 286.

3

Here, this case arises out of the Defendants' actions and contacts with the forum state and with Plaintiff and thus those actions satisfy the minimum contacts rule. Defendants contacted and interacted with California significantly in their actions, which are the subject of this case. Defendants entered into contracts with Plaintiff, a California resident. Plaintiff alleges that Defendants contacted Twitch's servers, located within California, to conduct hate raids and target Twitch users, the subject of this case. (Dkt. No. 40 at ¶¶ 43-51.) Thus, this Court has jurisdiction over Defendants.

### III.  Standards Governing Default Judgment.

After entry of default, a court may grant default judgment on the merits of the case. *See* Fed. R. Civ. P. 55. Upon default, the factual allegations of the complaint, except those concerning damages, are deemed to have been admitted by the non-responding party. *Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir.1977). "The district court's decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe,* 616 F.2d 1089, 1092 (9th Cir.1980). In determining whether to enter default judgment, a court should consider the following factors:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool,* 782 F.2d 1470, 1471-72 (9th Cir. 1986). Here, these factors weigh in favor of granting Plaintiff's motion for default judgment.

### 1.  Prejudice to Plaintiff.

A plaintiff is prejudiced if, absent the entry of a judgment, it will be left without a remedy. *Galaxia Elecs. Co. v. Luxmax, U.S.A.*, No. LACV1605144JAKGJSX, 2023 WL 2347085, at *30 (C.D. Cal. Feb. 1, 2023). If the Court denied Plaintiff's motion, it would likely be left without a remedy given Defendants' failure to appear or otherwise defend this action. *See Pepsico, Inc. v. Cal. Sec. Cans,* 238 F.Supp.2d 1172, 1177 (C.D. Cal. 2002). Plaintiff would be without recourse to obtain the proper injunction to prevent abuse of its platforms. *Facebook, Inc. v. Solonchenko*,

4

1  No. 21-CV-08230-LB, 2022 WL 18491616, at *6.  (N.D. Cal. Dec. 29, 2022), *report and*

2  *recommendation adopted*, No. C 21-8230 WHA, 2023 WL 420677 (N.D. Cal. Jan. 26, 2023).

3  Thus, the first *Eitel* factor weighs in favor of Plaintiff.

### 2. Merits of Plaintiff's Claims and Sufficiency of the Complaint.

After an entry of default, well-pled allegations in the complaint are deemed true, except for the amount of damages.  *See Fair Housing of Marin v. Combs*, 285 F.3d 899 (9th Cir. 2022).  The second and third factors overlap because the Plaintiff must properly state a claim, and the allegations in the complaint are deemed true.  *See Galaxia*, 2023 WL 2347085, at *30.  "Under an *Eitel* analysis, the merits of plaintiff's substantive claims and the sufficiency of the complaint are often analyzed together."  *Dr. JKL Ltd. V. HPC IT Educ. Ctr.*, 749 F. Supp 2d 1038, 1048 (N.D. Cal. 2010).  As a result, if the complaint is sufficient, the substantive claim has merit for the purposes of a Motion for Default Judgment.  (*Id.*)

#### i. Breach of Contract

Plaintiff alleges claims for breach of contract and fraud in the inducement.  To prevail on a claim for breach of contract, Plaintiff must show the existence of "a contract, plaintiff's performance or excuse for nonperformance, defendant's breach, and the resulting damages to plaintiff."  *Yelp Inc., v. Catron,* 70 F. Supp 3d 1082, 1099 (N.D. Cal 2014).

Plaintiff sufficiently alleges that a contract existed between the parties because Defendants created and used Plaintiff's accounts.  Defendants are bound by the terms of the contract with Plaintiff because they agreed to the terms of service when they created and used Plaintiff's services.  (Dkt. No. 40 at ¶¶ 28, 45, 47, 49,65-66.)  Courts have found that, in the process of registering for an online platform, clicking an "accept" button referring to terms of service constituted acceptance of a contract.  *Swift v. Zynga Game Network*, 805 F. Supp. 2d 904 (N.D. Cal. 2011).  By using Plaintiff's platform and its services, Defendants agreed to and became bound by Plaintiff's Terms of Service and policies.  (Id., ¶ 7.); see also *Yelp, Inc. v. Catron*, 70 F. Supp. 3d 1082, 1099 (N.D. Cal. 2014) ("Here, the Yelp terms of service is a contract."); *Craigslist, Inc. v. Realworks Group LLC*, 694 F. Supp. 2d at 1059 ("Plaintiff has alleged that the TOUs existed as a valid contract between it and all users, including the Defendants.").

Plaintiff alleges performance on the contract; Plaintiff allowed Defendants access to its platforms and "dutifully performed its obligations pursuant to the Terms and the Developer Terms."  (Dkt. No. 40 at ¶ 56.); *ILikeAd*, 2022 WL2289064, at *6.

Plaintiff also alleges that Defendants breached the contract by knowingly violating Twitch's Terms of Service.

Plaintiff's Terms prohibit, among other things:

1. uploading or distributing "any content that is…obscene…harassing, threatening, abusive, inflammatory, or otherwise objectionable";
2. "defam[ing], harass[ing], abus[ing], threaten[ing], or defraud[ing] users of the Twitch Services";
3. manipulating "identifiers in order to disguise the origin of any User Content transmitted through the Twitch Services";
4. "attempt[ing] to circumvent any content filtering techniques [Twitch] employ[s]";
5. "design[ing] bots that engage in offensive or deceptive practices (e.g., generate hate speech…)";
6. "shar[ing] content that may reveal private personal information about individuals, or their private property, without permission."

(Dkt. No. 40 at ¶ 31.)  Plaintiff alleges that Defendants breached each of these terms.  Defendants posted content racist, homophobic, and highly offensive content and harassing users of the Twitch Services.  (*Id.* at ¶¶ 43–46, 69.)  Plaintiff states Defendants manipulated their identifying information to disguise their actions and designed bots and fake accounts which were banned by Twitch.  (*Id.*)  Mango additionally is accused of breaching these terms by sharing user's private personal information by doxing and swatting users.  (*Id.* at ¶¶ 43–44, 47–49, 69.)

Finally, Plaintiff has demonstrated it was harmed by Defendants' actions by harming Plaintiff's reputation and by forcing Plaintiffs to incur the costs to investigate and remediate future harm to its users.  (*Id.* at ¶ 59; Dkt. No. 58 at 13.)

### ii. Fraud in the Inducement

In order to state a claim for fraud in the inducement, the plaintiff must allege "(a) a misrepresentation (false representation, concealment, or nondisclosure); (b) scienter or knowledge

6

of its falsity; (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Parino v. BidRack, Inc.*, 838 F. Supp 2d 900, 906 (N.D. Cal 2011) (citing *Lazar v. Super. Ct.*, 909 P.2d 981, 984 (Cal. 1996)). To make a claim for fraud, Plaintiff's pleadings must meet the heightened pleading standard under Federal Rule of Civil Procedure 9(b), which requires a Plaintiff to "state with particularity the circumstances constating fraud or mistake."

Plaintiff has not adequately pled a claim for fraud in the inducement. Plaintiff alleges that each time Defendants created a new account on Twitch and assented to the Terms, they made a misrepresentation because they had no intent to abide by these Terms. (Dkt. No. 40 at ¶¶ 77-78, 82.) Plaintiff further alleges that Defendants were aware of the falsity of that representation to abide by the Terms, because Twitch had already barred them from accessing its services before Defendants began creating new accounts to continue posting harassing content. (*Id.* at ¶ 81.) However, Plaintiff has not directly pled that Defendants sought to induce reliance based on their actions. Further, although Plaintiff states any reliance on its part was justified, it does not provide reasons for that justification. (*Id.* at ¶¶ 77, 82-83.) Therefore, Plaintiff has not pled a claim for fraud in the inducement sufficiently under the Rule 9(b) standard.

### 3. The Sum of Money at Stake in the Action.

The fourth *Eitel* factor focuses on the amount at issue in the action. "[C]ourts should be hesitant to enter default judgments in matters involving large sums of money." *Yelp Inc.*, 70 F. Supp. 3d at 1099-1100. "When the money at stake in the litigation is substantial or unreasonable, default judgment is discouraged." *Board of Trs. v. Core Concrete Const., Inc.*, 2012 WL 380304, at *4 (N.D. Cal. Jan. 17, 2012) (citing *Eitel*, 782 F.2d at 1472). However, when "the sum of money at stake is tailored to the specific misconduct of the defendant, default judgment may be appropriate." (*Id.*) (citations omitted); *see also Landstar Ranger, Inc. v. Parth Enters.*, 725 F. Supp. 2d 916, 921 (C.D. Cal. 2010) (holding this factor "requires that the court assess whether the recovery sought is proportional to the harm caused by defendant's conduct.").

Plaintiff seeks $328,164 in damages. (Dkt. No. 58 at 15.) While this amount is high, it is partially tailored to remedy actual costs incurred by Plaintiff. *Compare ILikeAd*, 2022 WL 2289064, at *7 (awarding Plaintiff the amount of $4,020,910, reasoning that "[a]lthough this

7

amount is large, it is tailored to remedy Defendants' specific misconduct.  Therefore, this factor weighs in favor of granting default judgment."), *with Eitel*, 782 F.2d at 1472 (a three-million-dollar judgment weighed against entering default judgment).  In supplemental briefing, Plaintiff provided additional information regarding damages.  (Dkt. No. 66.)  Plaintiff spent $73,664 in investigations, analyzing over 130,000 reports relating to hate raids and another $254,500 in technical fixes to their software.  (*Id.*)  However, Plaintiff states that these reports did not solely relate to Defendants' actions and "cannot be apportioned between the Defendants or the larger hate raid community."  (*Id.* at 4.)  As such, Plaintiff admits that to at least some extent, its requested damages are not directly tailored to the damages caused by Defendants.  While portions of the damages are tailored to Defendants' actions as discussed below, since other portions are not, this factor weights slightly against granting default.

### 4. Fifth Factor: The Possibility of a Dispute Concerning Material Facts.

Because Defendants have not answered the Complaint or otherwise appeared in this action, the possibility of a dispute concerning material facts is unknown.  *See ILikeAd*, 2022 WL 2289064, at *7-8.  Thus, this factor supports granting default judgment.

### 5. Sixth Factor: Whether the Default was Due to Excusable Neglect.

Excusable neglect can weigh against default judgment.  In *Eitel*, "the defendant's response was late because the parties had previously agreed to 'what appeared to be a final settlement agreement' and '[the defendant] reasonably believed that the litigation was at an end[.]' Because of his reasonable reliance and prompt response when the agreement dissolved, there was excusable neglect for the defendants' untimely response.  *Solonchenko*, 2022 WL 18491616, at *6 (quoting *Eitel*, 782 F.2d at 1471-72).

By contrast, the risk that there was excusable neglect is significantly lower.  First, Plaintiff went to great lengths to properly serve Defendants.  (Dkt. No. 31.)  Plaintiff's initial complaint listed CreatineOverdose and CruzzControl as the two participants in the hate raids.  (Dkt. No. 1.)  Plaintiff identified CruzzControl's true identity, Chris Vostermans, and listed it in an amended

8

complaint.[1]  (Dkt. No. 16.)  Subsequently, Plaintiff sought discovery from third parties to find CreatineOverdose's true identity and in the process found and that Mango was an additional participant in the alleged hate raids, and Plaintiff named him as a defendant in the second amended complaint.  (Dkt. No. 40.)  Plaintiff attempted to locate CreatineOverdose and Mango's physical addresses and sought leave to serve the two by alternative means.  (Dkt. Nos. 37, 44.)  Alternative service was granted, and Mango was served over email, while CreatineOverdose was served by publication.  (Dkt. Nos. 45, 46.)  Since service of process was adequate but it is unclear if Defendants are aware of this litigation, this factor is neutral.  *See Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp 2d 1039 (N.D. Cal. 2010) (finding that proper service of process and awareness of litigation foreclosed the possibility of excusable neglect.).

### 6. Seventh Factor: The Strong Policy Underlying Favoring Decisions on the Merits.

In *Eitel*, the Ninth Circuit stated that "[c]ases should be decided on the merits whenever reasonably possible."  *Eitel*, 782 F.2d at 1472.  However, "this preference, standing alone, is not dispositive."  *PepsiCo*, 238 F. Supp. 2d at 1177 (citation omitted); *see also* Fed. R. Civ. P. 55(b) (providing that the "termination of a case before hearing the merits is allowed whenever a defendant fails to defend an action.").  Here, because Defendants have not participated in the proceedings, a decision on the merits would not otherwise be possible.  Further, Plaintiff seeks to protect the users of its platform from harassment, release of personally revealing information, and potential danger from swatting.  Given the public safety concerns that state in this situation, Rule 55(b) permits the court to grant default judgment.

The Court finds that *Eitel* factors one through three, five, and seven outweigh the preference for a decision on the merits.  The undersigned therefore RECOMMENDS the entry of default judgment.

### IV. Relief Sought.

Once liability is established through a defendant's default, a plaintiff is required to

---

[1] Vostermans ultimately settled with Plaintiff and is no longer a Defendant in this case. (Dkt. No. 27.)

9

establish that the requested relief is appropriate. *Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977). Plaintiff is seeking damages and permanent injunction. (Dkt. No. 58 at 15-17.)

### 1. Damages

While the allegations in the Complaint are taken as true for purposes of default judgment, courts must make specific findings of fact in assessing the amount of damages. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). The Court has discretion to determine the amount of damages to be awarded. *Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 712 (9th Cir. 1999).

Here, Plaintiff seeks damages in the amount of $328,164. Plaintiff separates these damages into (1) investigation costs, totaling $73,664, and (2) technical remediation costs, totaling $254,500. (Dkt. No. 66.) Plaintiff admits that the investigation costs may have gone to hate raids and reports that were not related to Defendants and that, although Defendants' methods were novel, the technical remediation may have also served to prevent other hate raid actors from attacking. (*Id.* at 3-8.) Plaintiff argues that Defendants are liable for the whole of these damages because Defendants are jointly and severally liable and because Defendants' conduct was a necessary and sufficient cause of the harm. Plaintiff argues that large-scale hate raid activity is indivisible between Defendants and any others responsible for these actions.

Under breach of contract, an injured party should receive "as nearly as possible the equivalent of the benefits of performance.'" *Lisec v. United Airlines, Inc.*, 10 Cal.App.4th 1500, 1503, 11 Cal.Rptr.2d 689 (1992); see also *Brandon & Tibbs v. George Kevorkian Accountancy Corp.*, 226 Cal.App.3d 442, 455 (1990) ("The aim is to put the injured party in as good a position as he would have been had performance been rendered as promised.") Plaintiff states that of the $73,664 spent in investigations, $44,372 was spent reviewing and analyzing the reports, and another $29,292 was spent identifying accounts used the in the attack, investigating the actors, and banning responsible individuals. (Dkt. No. 66 at 7.) Plaintiff states that Defendants used thousands of bots and anonymized accounts to conduct their attacks, hiding their identity behind "botnets." Separating out which portions of these investigations directly addressed anonymous

10

accounts created by Defendants and which were created by third parties would be nearly impossible. However, Plaintiff alleges that the novel nature of Defendants' attacks made investigations necessary and prompted large scale investigations of reports made to the company. (Dkt. No. 66 at 8, 10.) The Court finds that Defendants' actions were the direct cause of Plaintiff's investigative actions, and, although some of these investigations may have ultimately uncovered actions by other people or entities, the investigations were reasonable and necessary to determine whether Defendants were the perpetrators of harassment. Therefore, the Court recommends awarding $73,664 in investigative costs.

Plaintiff states it spent $254,500 in costs to "engineer technological, security, and other fixes to stop Defendants' hate raids, and to implement other measures to detect and enforce against Defendants' evasion techniques." (Dkt. No. 66 at 7.) These steps were put in place to combat the methods Defendants used to attack Plaintiff, including concealing their identities and routing requests through "botnets." Plaintiff admits that other hate raid actors use the same methods as Defendants and that the technical fixes implemented served a dual purpose of preventing future attacks by Defendants and by other third-party hate raid actors. (*Id.* at 11.) Although these remedies have the subsidiary effect of preventing other bad actors, Plaintiff was required to implement them as a result of Defendants' actions in breaching the contracts here. Thus, Plaintiff shows that it incurred the cost of remedial actions as a "but for" cause of Defendants' breach of contract.

The Court finds that Plaintiff has demonstrated that it incurred $328,164 in damages and RECOMMENDS AWARDING Plaintiff that amount.

### 2. Injunctive Relief

California law permits courts to grant equitable relief (including an injunction) in breach of contract cases, provided the plaintiff has no adequate remedy at law. *Wilkinson v. Widerkehr*, 101 Cal. App. 4th. 822, 832 (2002). To obtain permanent injunctive relief, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4)

1   that the public interest would not be disserved by a permanent injunction." *eBay Inc. v.*

2   *MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The Court has discretion to grant or deny

3   permanent injunctive relief.  *Id.*

4         "[A]n injunction should be tailored to eliminate only the specific harm alleged ... but

5   should not be so narrow as to invite easy evasion." *Sahinturk*, 2022 WL 1304471, at *12 (quoting

6   *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012) (cleaned up)).  Plaintiff

7   requests the following injunction:

> Defendants and their officers, agents, representatives, servants, employees, successors and assigns, and all other active concert or participation with Defendants are permanently enjoined from:
>
> (a) Using or accessing the Twitch Services;
>
> (b) Posting content on the Twitch Services, including in the Twitch chat function, that is prohibited by the Terms, including racist, homophobic, xenophobic, or any other harassing content; and
>
> (c) Assisting any individual or company in engaging in the conduct described in 1(a)-(b) above.

15  (Dkt. No. 58-4 at 4.)

16        Each of the four factors support granting injunctive relief to Plaintiff.  Plaintiff has pled it

17  has suffered irreparable injury to its reputation and goodwill within the larger streaming

18  community.  (Dkt. No. 40 at ¶¶ 56-59, 84.)  Defendants' actions caused significant harm to users

19  of Plaintiff's platform, and without an injunction, those users may continue to suffer further harm,

20  further damaging Plaintiff's reputation.  Plaintiff has stated that Defendants' harassment is

21  ongoing and has not ceased despite Plaintiff's remedial actions.  (Dkt. No. 40 at ¶ 52-53.)  As

22  such, remedies at law cannot adequately cure the harm of future bad activity.  DVD *Copy Control*

23  *Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 726 (2009) (injunctive relief is available

24  to enforce contract terms when plaintiff suffered harm to goodwill).  Additionally, the balance of

25  hardships weighs in favor of granting injunctive relief.  As Defendants are in default, they have

26  not demonstrated any hardship they would incur from being barred from Twitch's platform or

27  continuing to post harassing content.  However, any potential harms from being banned from

28  Plaintiff's streaming service are outweighed by the continued harm Plaintiff faces from continued

hate raids and harassment on its platform. Finally, the public interest is served by issues this injunction, as it will prevent others from being subject to harassment, doxing, or swatting by Defendants.

The Court RECCOMMENDS granting Plaintiff's injunction in whole.

## CONCLUSION

For the reasons set forth above, the Court recommends Plaintiff's motion for default judgment be GRANTED as to breach of contract and DENIED as to fraud in the inducement. The Court RECOMMENDS that:

1. Plaintiff be AWARDED $328,164 in damages.
2. Plaintiff's request for injunctive relief be GRANTED as to permanently enjoining Defendants and their officers, agents, representatives, servants, employees, successors and assigns, and all others in active concert or participation with Defendants from:
   a. Using or accessing the Twitch Services;
   b. Posting content on the Twitch Services, including in the Twitch chat function, that is prohibited by the Terms, including racist, homophobic, xenophobic, or any other harassing content; and
   c. Assisting any individual or company in engaging in the conduct described in 1(a)-(b) above.

**IT IS SO ORDERED**.

Dated: July 20, 2023

SALLIE KIM
United States Magistrate Judge